92 N.Y.2d 107 (1998)
699 N.E.2d 852
677 N.Y.S.2d 228
In the Matter of the Liquidation of Union Indemnity Insurance Company of New York.
Royal Bank & Trust Company, Respondent,
v.
Superintendent of Insurance of the State of New York, as Administrator of the New York Property/Casualty Insurance Security Fund, and as Liquidator of Union Indemnity Insurance Company of New York, Appellant.
Court of Appeals of the State of New York.
Argued May 5, 1998
Decided June 11, 1998.
Herzfeld & Rubin, P. C., New York City (David B. Hamm and Herbert Rubin of counsel), and Joseph Termini for appellant.
Gibson, Dunn & Crutcher, L. L. P., New York City (Jerry J. Strochlic and Preeta D. Bansal of counsel), for respondent.
Judges TITONE, SMITH, CIPARICK and WESLEY concur with Judge BELLACOSA; Chief Judge KAYE concurs in part and dissents in part in a separate opinion; Judge LEVINE dissents and votes to reverse in another opinion.
*110 BELLACOSA, J.
Defendant Superintendent of Insurance, as Administrator of the New York Property/Casualty Insurance Security Fund (Security Fund) and as Liquidator of Union Indemnity Insurance Company of New York (Union), appeals from a Supreme Court judgment, pursuant to leave granted by this Court. The judgment directed payment to plaintiff Royal Bank and Trust Company (Royal) of $10,937,753.25. The source of the satisfaction of the judgment is the State Security Fund. The appeal brings up for review a prior nonfinal Appellate Division order which affirmed Supreme Court's direction that the Security Fund pay Royal's claims with postliquidation interest and attorney's fees.
We must decide whether (1) Insurance Law § 7434 (b) excuses the Security Fund from responsibility for postliquidation interest on Royal's claims, and (2) Insurance Law § 7608 (c) prohibits the Security Fund from adding interest and attorney's *111 fees to the claims payment because these obligations would tip Royal's recovery over the limit of liability of the insuring instruments. Since neither statutory construction supports appellant's desired outcome for the case, we affirm.

I.
In 1983, Union issued bonds to Royal securing the payment of promissory notes signed by 55 investors in Harlan Coal Processors, Ltd., a limited partnership which had borrowed $3,400,000 from Royal. When Harlan and most of the individual investors failed to make timely repayments, Royal demanded payment from Union under the bonds. In 1985, after making partial payment, Union was placed into liquidation by Supreme Court, based in part upon the finding that it was insolvent. The Superintendent was named as its Liquidator (hereinafter referred to under either title or as appellant).
In 1986, Royal filed 55 separate proofs of claim in Union's liquidation proceeding. It demanded indemnification and payment from the Security Fund pursuant to article 76 of the Insurance Law, for any and all amounts which may be due Royal under the individual investor bonds and proofs of claim. Each claim had three components: principal ($42,500 each), pre- and postliquidation interest, and attorney's fees. After the Superintendent denied indemnification because the bonds were not based upon risks located in New York, Supreme Court annulled the determination and remitted for plenary reconsideration (Matter of Royal Bank & Trust Co. v Superintendent of Ins., 148 Misc 2d 863, affd for reasons stated below sub nom. Matter of Union Indem. Ins. Co., 179 AD2d 374, also affd for reasons stated at Sup Ct, except insofar as discussion of superseding legislation and the reasons for its enactment 80 N.Y.2d 983).
Justice Gammerman, who has presided over all phases of this matter for more than a decade, then granted Royal's motion for partial summary judgment and directed payment of interest and attorney's fees on the claims. Supreme Court rejected the Liquidator's arguments that Insurance Law § 7434 (b) and § 7608 (c) barred the payment of postliquidation interest and attorney's fees. The court held that although Insurance Law § 7434 (b) limits the payment of interest on dividends from the estate of the bankrupt-insurer, this was not a request for payment from Union's estate but, rather, a claim against the statutory Security Fund, a distinct source. The court also rejected the argument that the term "limit of liability" in Insurance Law § 7608 (c) meant the maximum amount permitted *112 to be paid by the Security Fund regardless of additional obligations imposed by a securing instrument, and that this amount was determined by the face amount of the policy or bond. Noting that the express legislative purpose of the recodification of the Insurance Law in 1984 was "to recodify, without substantive change, the insurance law in effect immediately prior to the effective date of this chapter" (Insurance Law § 102), the court concluded that the Security Fund "should contain no strictures respecting the limits of liability" because the earlier version of the statute did not contain any such substantive restrictions. The court emphasized the absence of any language in the bonds themselves pertaining to limits of liability, and stated that interest was an integral component of the risk covered by the bonds. The court awarded attorney's fees because the bonds expressly authorized them. This 1994 ruling was affirmed in 1996 (225 AD2d 379).
After an interim nonjury trial in October 1995, Supreme Court determined that the Superintendent failed to establish the defenses of lack of standing and fraud, and held that the Security Fund should be the source of payment on the bonds. In March 1997, Supreme Court added the recoverable rate of interest from the Security Fund (12% until the date of the order of Union's liquidation, and 9% thereafter). Notably, Supreme Court's award of 9% interest from the date of the order of Union's liquidation does not correspond to the interest rate specified in the bonds. Royal's appeal of Supreme Court's March 1997 ruling on the rate of interest, filed in November 1997, is currently pending at the Appellate Division. The parties then stipulated to the amount of attorney's fees and the principal amounts and interest due under the bonds pursuant to the earlier legal determinations of Supreme Court and the Appellate Division. They reserved their rights to appeal those determinations and this Court granted the Superintendent's motion for leave to appeal.
The Superintendent presses precise statutory construction arguments that (1) Insurance Law § 7434 (b) prohibits payment of postliquidation interest out of the Security Fund, and (2) Insurance Law § 7608 (c) prohibits the Security Fund from paying interest and attorney's fees because inclusion of these amounts would result in a total payment over the limit of liability of the underlying bonds.
These restrictions do not appear in the statutes themselves and we are not persuaded that interpretive contentions justify such substantive transformations of the governing principles. *113 Moreover, the express language of the underlying bonds provides for payment of interest and attorney's fees and those contractual undertakings more specifically apply and cogently prevail in these circumstances. Thus, we are satisfied that the courts below ruled correctly in each respect.

II.
It is useful to frame the analysis within the context of the underlying purpose of the Security Fund and the particular type of bond at issue in this long-standing source-of-payment dispute. Then we must specify the nature and scope of the judicial review power necessary and appropriate to solve the multifaceted puzzle of this set of claims.
The Security Fund was initially enacted as a special benefit to protect New York insureds from the insolvency of companies underwriting automobile liability insurance (see, Matter of Union Indem. Ins. Co., 140 Misc 2d 702, 704, later proceeding Matter of Snyder Tank Corp. v Superintendent of Ins., 150 AD2d 992, lv denied 75 N.Y.2d 704, affd 151 AD2d 301 [vacating 150 AD2d 992]). The protection was then extended to other forms of casualty property insurance. In his statement in support of legislation creating the Security Fund, the then-Superintendent of Insurance stated that payment from the Security Fund would be 100 cents on the dollar and would be made by the Fund itself (1969 Report to Governor by Insurance Dept, "The Public Interest Now in Property and Liability Insurance Regulation," at 61). It has been described as "an extraordinary benefit" (Matter of Royal Bank & Trust Co. v Superintendent of Ins., 148 Misc 2d 863, 866, supra). The payments made from the Fund are restricted to those circumstances and claims specifically authorized by statute.
The type of insuring instrument at issue in this case is a financial guaranty surety bond. It was covered by the Security Fund at the time of the insolvency and claims at issue; that is not in question. In 1989, however, Insurance Law article 69 was enacted to supplant the regulation of this particular type of insurance. This amendment removed financial guaranty insurance from the protection of the Security Fund (1989 McKinney's Session Laws of NY, at 2057, 2389).
In support of this substitutive legislation, then-Governor Cuomo described financial guaranty bonds as "a relatively new insurance product which, in essence, insures the timely payment of principal and interest of numerous kinds of publicly traded debt" (id., at 2389 [emphasis added]). The State Executive *114 Department also supported the 1989 changes with the assertion that financial guaranty insurance had experienced "phenomenal" growth in the prior 10 years, and that although it was "subject to rules applicable to property/casualty insurance generally," it was "a unique kind of coverage requiring specialized treatment" (id., at 2053). The narrative continued that financial guaranty insurance was "issued to minimize risk of loss to insured obligees or indemnitees for: the payment of principal and interest on public and private debt, fluctuations in interest rates, fluctuations in currency rates, fluctuations in financial or commodity indices, and changes in value of assets and price levels in general" (id., at 2054 [emphasis added]). In addition to providing useful historical insights and context concerning the sweep of coverage and reimbursements payable out of the Security Fund, these observations and understandings also suggest that, by denying coverage of Royal's claims for postliquidation interest, the Superintendent is seeking to garner a retroactive functional effect from the 1989 amendment, even though the statute was intended to provide only a prospective change (compare, Majewski v Broadalbin-Perth Cent. School Dist., 91 N.Y.2d 577).
Appellant contends that the lower courts erred in awarding Royal postliquidation interest and attorney's fees. In furtherance of this assertion, he advances two statutory arguments, and further contends that the lower courts should have deferred to his restrictive interpretation, as neither irrational nor unreasonable.
The Superintendent of Insurance, as administrator of the Security Fund (a role distinct from that as Liquidator in this particular circumstance [see, Insurance Law § 7601 (e)]), has authority to "prescribe[,] * * * withdraw or amend * * * regulations * * * interpreting the provisions of [the Insurance Law] and * * * governing the procedures to be followed in the practice of the department" (Insurance Law § 301 [c], [d]; see, Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.  Superintendent of Ins.], 60 N.Y.2d 1, 8). To be sure, when the Superintendent's "interpretation of a statute or its application involves knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom, the courts regularly defer" to that interpretation unless it is irrational or unreasonable (Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459; see, Paramount Communications v Gibraltar Cas. Co., 90 N.Y.2d 507, 513-514, rearg denied 90 N.Y.2d 1008; Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.  Superintendent of Ins.], supra, 60 NY2d, at 8).
*115 Where, however, as here, "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency" (Kurcsics v Merchants Mut. Ins. Co., supra, 49 NY2d, at 459). The questions in this case relate to what the Legislature allowed or prohibited under the Security Fund scheme  matters substantive and preserved for independent judicial assessment. Judicially engrafted public policy, as urged by appellant, cannot trump or amend a legislatively enacted formula for reimbursements, reasonably plain on careful and appropriate analysis.

III.

A.
We turn then to the appellant's statutory interpretation claim that Insurance Law § 7434 (b) prohibits the Security Fund from paying postliquidation interest on Royal's claims. That section states:
"No creditor shall be entitled to interest on any dividend by reason of delay in payment of such dividend" (Insurance Law § 7434 [b]).
The lower courts held that this prohibition applied to claims against the estate of a bankrupt-insurer, not to reimbursements sought discretely from the Security Fund.
The Security Fund is governed by article 76 of the Insurance Law and the Liquidator acknowledges that section 7434 (b) does not, by its own terms, apply to the Security Fund but, rather, applies to liquidation estates. Instead, he constructs a tenuous thesis around the facial inapplicability of section 7434 (b) to the Security Fund, arguing that section 7434 (b) applies to the Security Fund by linkage through Insurance Law § 7603 (a) (1). That provision states:
"The property/casualty insurance security fund shall be used in the payment of allowed claims remaining unpaid, in whole or in part, by reason of the inability due to insolvency of an authorized insurer to meet its insurance obligations under policies" (Insurance Law § 7603 [a] [1] [emphasis added]).
*116 The Superintendent hooks up the theory by the assertion that the Security Fund is permitted to make payment only upon an "allowed claim," which section 7602 (g) defines as:
"a claim * * * which has been allowed by the court in a proceeding under article seventy-four of this chapter" (Insurance Law § 7602 [former (g)]).
The final locution is that since section 7434 (b) prohibits the payment of postliquidation interest, a claim for postliquidation interest is not an "allowed claim" which is payable even by the article 76 Security Fund.
The plain answer to this circumnavigation and interlineation of the statutory language is that the inclusion of the term "dividends" and the absence of the term "payments" in section 7434 (b) unravels the too-finely spun argument. Those specifications essentially demonstrate that the limitation in section 7434 (b) does not and should not apply to claims against the Security Fund but, rather, should be confined to claims only against insolvent estates.
Indeed, Royal cogently litanizes that distributions to claimants from the Security Fund are consistently referred to as payments (see, e.g., Insurance Law § 7603 [a] [1] ["The property/casualty insurance security fund shall be used in the payment of allowed claims remaining unpaid, in whole or in part, by reason of the inability due to insolvency of an authorized insurer to meet its insurance obligations under policies"] [emphasis added]; Insurance Law § 7603 [a] [2] ["No payment from the property/casualty insurance security fund shall be made to any person who owns or controls ten percent or more of the voting securities of the insolvent insurer and no payment on any one claim shall exceed one million dollars, provided that the amount of payment on a claim and the aggregate for all claims shall be further limited by the provisions of paragraph two of subsection (g) of section seven thousand six hundred two of this article"] [emphasis added]; Insurance Law § 7603 [c] [1] ["Whenever the superintendent determines * * * that the net value of the property/casualty insurance security fund is at least one hundred fifty million dollars, no further contributions shall be made after the fund year in which the determination is first made, but if thereafter the superintendent determines that payments made from the fund by the commissioner to the superintendent * * * have reduced the net value to an amount less than such amount, the superintendent shall cause contributions to be resumed"] [emphasis added]; *117 Insurance Law § 7608 [a] ["Payments from the funds shall be made by the commissioner to the superintendent"] [emphasis added]; Insurance Law § 7608 [b] [1] ["Payments from the funds upon allowed claims give no right of recovery by the commissioner * * * against principals or assureds under policies of insurance or surety bonds"] [emphasis added]; Insurance Law § 7608 [c] ["No payment from the funds shall exceed the limit of liability provided for in the insurance policy or surety bond"] [emphasis added]).
On the other hand, distributions from insolvent estates are treated and referred to as dividends (see, e.g., Insurance Law § 7434 [b] ["No creditor shall be entitled to interest on any dividend by reason of delay in payment of such dividend"] [emphasis added]; Insurance Law § 7434 [c] ["Any claimant of another state or foreign country who is entitled to, or receives, a dividend upon his claim * * * shall not be entitled to any further dividend * * * until all other claimants of the same class irrespective of residence * * * shall have received an equal dividend upon their claims"] [emphasis added]).
Royal emphasizes that section 7434 (a) refers to both types of distributions  payments and dividends  and presses that this recognition of the different categories and the reference to only dividends (distributions from insolvent estates) in section 7434 (b) manifests the legislative intention to include only distributions from an insolvent estate.
We are satisfied that the weight of analysis, authority and sustainable interpretation of these complex, regulatory and security-type statutes support the lower courts' determinations that the prohibition of section 7434 (b) against the payment of interest applies to claims against liquidation estates only. It has no relevant or dispositive impact, in the circumstances presented here, to the Security Fund, as to pre- or postliquidation interest.
We are mindful of the correct observation by the Superintendent concerning an historical common-law aspect. That rule showed that, in the distribution of the assets of an insolvent company, a liquidator was prohibited from paying interest on claims against funds unless an estate proved sufficient to discharge the principal claims in full, with surplus sufficient to pay interest (see, Matter of People [Norske Lloyd Ins. Co.], 249 N.Y. 139, 146-147; People v American Loan & Trust Co., 172 N.Y. 371, 379, remittitur amended 177 N.Y. 467). The observation, however, fails to connect a compelling reason for this common-law *118 limitation, which governs liquidation estates, to carry over and apply to this statutory Security Fund, unless the Legislature says so.
In fact, on one other occasion, this Court rejected the argument that the common-law prohibition against postliquidation interest should apply to a statutory fund. In Matter of People (Norske Lloyd Ins. Co.) (249 N.Y. 139, supra), the insolvent insurance company, a Norwegian corporation, had been required by the Insurance Law to deposit securities with the State Insurance Department as a prerequisite to doing business in the State. When the corporation became insolvent, liquidators were appointed. Claimants who dealt with the company in the United States were entitled to the protection of the statute and to share in the distributions made under the statute. Other creditors, who dealt with foreign branches of the company, were entitled to share only in the distribution of assets by the liquidators. After the statutory fund paid the claims of eligible creditors, a large surplus remained.
The question presented for this Court's resolution was whether those creditors, who had received payment from the fund, were also entitled to interest upon their claims which accrued during the liquidation period. Although claimants eligible for coverage from the statutory fund had their principal claims paid in full, even after transmission of the fund surplus to the liquidators, those claimants who were not eligible for fund coverage would receive dividends amounting to barely 40% of their claims. The Appellate Division held that, under these circumstances, the fund could not pay interest (id., at 145-146).
This Court reversed and noted the general rule that "`after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds'" (id., at 146, quoting Thomas v Western Car Co., 149 US 95, 116-117). Noting that the assets in the fund, which was administered by the Superintendent of Insurance, were more than sufficient to pay the claims, with interest, of all creditors eligible for fund coverage (id., at 147), the Court stated nevertheless that it could not "escape the conclusion that the Legislature in providing carefully for the deposit here of capital by the foreign company for the security and protection of those who transact business with the company here intended to provide protection as complete as can be given to them through the liquidation of the assets or capital so deposited for their benefit" (id., at 149 [emphasis added]). *119 Thus, the Court determined that the creditors were entitled to postliquidation interest from the fund. In sum, Norske Lloyd buttresses our conclusion that, in the absence of a sustainable manifestation that the Legislature, when it created the statutory Security Fund, adopted comparable common-law limitations of the kind proposed in this case by appellant, that limitation does not apply.
The purpose of the common-law rule was to satisfy all creditors equally and to preserve the limited funds of the estate of an insolvent insurer. The Security Fund, however, serves a fundamentally different purpose, though its assets are also entitled to their own statutory protections. In accordance with the intended goal of article 76 security funds, "liability may extend beyond the assets of the defunct insurance company, as such claims may eventually be allowed against the insurance security fund established pursuant to article 76" (compare, Matter of Transit Cas. Co. [Digirol  Superintendent of Ins.], 79 N.Y.2d 13, 23-24 [Kaye, J., dissenting], cert denied 506 US 869).
The appellant Superintendent's "allowed claim" argument is also unavailing. Postliquidation interest may appropriately constitute an allowed claim. "The rule that interest is not allowed after the property of an insolvent has passed into the hands of an official liquidator applies only in the distribution of the proceeds of the property by the liquidator where the proceeds are insufficient to pay all creditors in full" (Matter of People [Norske Lloyd Ins. Co.], 249 N.Y. 139, 147, supra). Indeed, in this case, although insolvent Union's estate assets are evidently insufficient to pay all estate claims in full, no comparable plight is advanced with respect to the Security Fund's inability to pay claims in accordance with its statutory mission, with interest.
Notably, the Superintendent suggests that payment of interest in this case might create the possibility that additional premiums will be required to replenish the Fund earlier than contemplated by the extant statutory schedule. This speculation does not warrant a judicial engraftment of ineligibility for payments under section 7434 (b), which, on its face, is inapplicable to article 76 and the Security Fund. That kind of judicial soldering might functionally cut off part of an otherwise legitimate statutory repayment.
In addition, the Superintendent's argument that Matter of Professional Ins. Co. (Jason  Superintendent of Ins.) (67 AD2d 850, affd for reasons stated at App Div 49 N.Y.2d 716) supports *120 this "allowed claim" argument is overstated and his reliance is unpersuasive. In Jason, the claimant submitted an untimely proof of claim in a liquidation proceeding. Pursuant to then-section 543 of the Insurance Law, the claim was marked "deferred," which could be paid only if all timely filed claims were paid in full. The lower court qualified the claim as timely, and admitted it to participation in the Security Fund, stating that no prejudice would arise by granting that relief (id., at 850). The Appellate Division reversed, stating that the Security Fund was available for only allowed claims, and that "others, such as petitioner's `deferred' claim, must look only to the surplus, if any, of the insurer's assets remaining after payment in full of all `allowed claims'" (id., at 850-851). This fact-specific holding relating to the allowance of "deferred" claims in no way justifies the categorical preclusion now urged by the Superintendent in this case  that postliquidation interest never constitutes an allowed claim payable out of the Security Fund.
Pertinently, the legislative history for the predecessor of Insurance Law § 7434 (b) (former section 545 [1-a] had substantially the same language as the current section) supports the narrower application of section 7434 (b) found by the lower courts. The predecessor to section 7434 (b) was enacted specifically to overrule Matter of Consolidated Indem. & Ins. Co. (281 N.Y. 680, affg 256 App Div 604, rearg denied 281 N.Y. 830). It had allowed a sympathetic creditor to recover interest on a claim where the Superintendent had unsuccessfully litigated the claim. In support of the overruler legislation, the Insurance Department noted that its purpose was "to eliminate the liability of an estate in liquidation for interest on dividends" (Mem of NY St Ins Dept, Bill Jacket, L 1940, ch 621 [emphasis added]).
The plain language of section 7434 (b) indicates that the prohibition of the payment of interest applies in the limited circumstance of the payment of a delayed or deferred claim in an insolvent estate, rather than to payment from the Security Fund. As noted, the legislative history of the predecessor to section 7434 (b) strongly comports with this assessment. The determination of every level of judicial review that Insurance Law § 7434 (b) is inapplicable to the Security Fund is finally underscored by the fact that its predecessor was enacted prior to the creation of the Security Fund.
Notably, because we agree with Royal that section 7434 (b) does not prohibit the payment of postliquidation interest, we need not address or settle Royal's argument or the Liquidator's *121 countercontention as to the precedential sweep of Matter of Union Indem. Ins. Co. (Solco Plumbing Supply) (199 AD2d 209, 212, lv denied in part 83 N.Y.2d 944 [Appellate Division modified Supreme Court's order disallowing a claim for postliquidation interest, and allowed the claim, stating that because the evidence did not indicate that the funds were insufficient to pay all claims in full with interest or that the awarding of interest would impose liability greater than the amount of Union's bonds, the general rule that interest is not allowed after the property of an insolvent has passed into the hands of an official liquidator was not applicable]).

B.
We must also consider another strand of the Superintendent's second statutory construction argument  that Insurance Law § 7608 (c) prohibits the payment of interest and attorney's fees in this case because awarding these items aggregates the total payment over the limit of liability on the surety bonds. Section 7608 (c) states:
"No payment from the funds shall exceed the limit of liability provided for in the insurance policy or surety bond" (emphasis added).
The Superintendent argues that section 7608 (c) prohibits the Fund from paying interest and attorney's fees where these payments would exceed the face limit of the insuring instrument, and that the term "limit of liability" refers to the amount set forth on the face of the insuring instrument, exclusive of any additional or supplementary payments which may be required under the terms of the instrument. In this case, the Superintendent posits that the limit of liability is equal to the principal amount of each bond, i.e., $42,500, or $3,087,875.08 as the aggregate principal under the bonds.
Royal emphasizes an analytical weakness of the Superintendent's argument that the limit of liability of the bonds in this case should be limited to the principal amount of each bond. After all, the Superintendent evidently acquiesces (albeit not formally conceding the point) in the Security Fund's responsibility in this case and circumstance to pay preliquidation interest on these bonds, and opposes only postliquidation interest payments. Royal argues that submission to preliquidation interest responsibility belies the Superintendent's contention that the limit of liability provision caps the principal recovery amount of each bond. Royal argues that the Superintendent's *122 stance on this issue creates an unsupportable distinction between pre- and postliquidation interest which does not exist in the statute, nor does logic or practical appreciation or application support this bifurcated treatment.
In addition, the Superintendent's postargument acknowledgment that the cost of defense may qualify for Security Fund coverage further undercuts the logic and cogency of his argument that the limit of liability is strictly limited to the principal amount of the bonds. The Superintendent must adopt policies in a coherent and consistent manner with appropriate regard for those previously taken or must explain the reasons for variations among policies (see, Matter of Field Delivery Serv. [Roberts], 66 N.Y.2d 516, 520). The Superintendent fails to proffer a sustainable distinction between allowing the Security Fund to pay preliquidation interest and defense costs, while prohibiting payment of postliquidation interest. In sum, we are satisfied that Royal has the better of these arguments and reject the Superintendent's strained interpretation of section 7608 (c) in this respect, as did the lower courts.
Although noting that "a literal reading of the statute favors the Liquidator's interpretation," the trial court also determined that the Superintendent's interpretation of the term "limit of liability" would defeat the core purpose of the 1984 recodification of the Insurance Law  "to recodify, without substantive change, the insurance law in effect immediately prior to the effective date of this chapter" (Insurance Law § 102). Section 330 (2) and section 333 (2) of the former Insurance Law pertained to motor vehicle insurance policies which, by their terms, have an established limitation of liability represented by the coverage. In contrast, the property and liability insurance provision of former Insurance Law § 334 (2) contained no limit of liability provision. Because no substantive change was intended by the 1984 recodification, no justification exists to transfer the limit of liability clause and analysis, as appellant proposes to do with respect to the bonds at issue in this case.
Moreover, the financial guaranty bonds at issue expressly provide for the payment of interest and attorney's fees ("Surety further agrees with the Bank, to pay to the Bank upon receipt by the Surety of the Bank's demand therefor, all costs and expenses [including but not limited to court costs, attorneys' fees and other legal expenses] incurred as expended by the Bank in connection with the enforcement of this Bond, together with interest on amounts recoverable under this Bond from the time such amounts become due until payment at the rate of 12% per *123 annum" [emphasis added]). Thus, even if the term "limit of liability" was applicable here, a potent and potential contradiction would arise that would favor a rejection of a particular limit on payment from the Security Fund against the express terms and agreement under the surety bond instruments themselves. On their face, they expressly provide for interest on amounts recoverable under the bonds from the time the amounts become due until payment, and for the payment of court costs, attorney's fees and other legal expenses incurred as expended by Royal in enforcement of the bonds.
Indeed, the statements made by then-Governor Cuomo and the State Executive Department in support of the 1989 legislation, removing financial guaranty insurance from the ambit of Security Fund coverage, fortify the historical rooting and cogency of the determination by the lower courts in this case that full interest was an integral component of the obligation and risk which the financial guaranty bonds were designed to protect and for which the Security Fund is responsible in this instance.

IV.
At this point in the opinion, it is necessary to respond discretely to some of the dissent's disagreements with our holding. The initial and main point of departure for the dissent involves the degree of deference which should be afforded to the Superintendent's handling of the statutory provisions governing this dispute. The dissent posits that "until today, whenever this Court has been called upon to interpret the statutory provisions governing the Security Fund, we have never annulled a reasonable statutory construction by the Superintendent" (dissenting opn, at 130). As an initial matter, we do not share the dissent's view that the Superintendent's strained circumnavigation of articles 74 and 76 of the Insurance Law, to justify his result, is reasonable.
Moreover, it is useful to remember at this juncture that in this very proceeding, this Court has already affirmed the lower courts' rejection of the Superintendent's construction of statutory provisions governing the Security Fund at an earlier stage of this saga (see, Matter of Royal Bank & Trust Co. v Superintendent of Ins., 148 Misc 2d 863, 866, affd for reasons stated below sub nom. Matter of Union Indem. Ins. Co., 179 AD2d 374, also affd for reasons stated at Sup Ct, except insofar as discussion of superseding legislation and the reasons for its enactment 80 N.Y.2d 983, supra [Superintendent as administrator *124 denied indemnification finding that the bonds did not satisfy the criteria set forth in Insurance Law § 7602 (g) and § 7603 (a) (1) (B)]). This case history serves as a virtual template against heightened or special deference to the Superintendent's interpretations in this unique, complicated set of circumstances including its entire, peculiar litigation history. Contrary to the dissent's attribution we neither express nor imply any technical precedential or law-of-the-case attributes to the earlier adjudications in this very case; they do, however, possess contextual value, relevance and cogency (dissenting opn, at 130-131).
Although we do not disagree with the dissent's statement that the resolution of the postliquidation interest issue "requires us to grapple with the intricate interplay between the Security Fund and an insolvent's liquidated estate" (id., at 131), the fact remains that this case presents questions of "pure statutory reading and analysis" (Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459, supra). The questions presented here  whether Insurance Law § 7434 (b) and § 7608 (c) prohibit the Security Fund from adding postliquidation interest and attorney's fees to Royal's claims  require an examination of various statutory provisions contained in articles 74 and 76 of the Insurance Law, the legislative history of these provisions, and case precedent. This exercise does not involve "knowledge and understanding of underlying operational practices," nor does it entail "an evaluation of factual data and inferences to be drawn therefrom" (id., at 459). Thus, because the questions presented are ones of "pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent," no justification for judicial deference to the Superintendent's interpretations is warranted (id., at 459).
Finally in this regard, it is notable that most of the cases cited by the dissent as support for the position that this Court should defer to the Superintendent's construction are distinguishable in that they involve the agency's interpretation of a regulation which the agency promulgated, rather than a statute (see, Matter of John Paterno, Inc. v Curiale, 88 N.Y.2d 328 [Appellate Division properly deferred to Superintendent's interpretation of a regulation as barring broker from placing claims-made liquor liability policies in New York through an excess line broker]; Matter of American Tr. Ins. Co. v Abdelghany, 80 N.Y.2d 162 [Insurance Law § 5103 (e) and the implementing regulation requiring New York automobile insurance policies to provide the minimum uninsured motorist coverage mandated by the law of another State when the *125 insured automobile is involved in an accident in that State are valid]; Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 N.Y.2d 444 [Superintendent's regulations using aggregate industry data rather than individual carriers' line-by-line results to determine excess profit to be refunded on motor vehicle insurance policies not inconsistent with Insurance Law § 2329]; Ostrer v Schenck, 41 N.Y.2d 782 [regulation adopted by the Superintendent to control the masking of a group insurance arrangement is not in conflict with the Insurance Law and is a reasonable exercise of the Superintendent's broad power to protect beneficiaries of union-management welfare funds from abuses]; Breen v Cunard Lines S. S. Co., 33 N.Y.2d 508 [regulation permitting insurance policy to limit coverage of liability for bodily injury or property damage sustained in the process of loading or unloading to a lessee or borrower of the vehicle, or an employee of the named insured is valid and not in conflict with statutory provisions]).
Because the dissent's overarching disagreement with the majority's rationale is so dependent on its conclusion that this Court should defer to the Superintendent's implementation of the statutory provisions at issue, we need not address further features of the dissent's prongs except in these additional respects.
We are not persuaded by the dissent's acceptance of Royal's thesis that the payment/dividend distinction is unimportant because "neither the word payment nor dividend in section 7434, or for that matter, any part of article 74, was intended to refer expressly to the Security Fund  rendering any payment/dividend distinction in article 74 meaningless for our purposes" (dissenting opn, at 133). First, although the dissent correctly notes that the predecessor statute to section 7434 (b) was enacted prior to the creation of the Security Fund, the distinction between payments and dividends predates even the 1932 statute which, according to the dissent, is the source of the word "payments" in section 7434 (a) (id., at 133). In Matter of People (Norske Lloyd Ins. Co.) (249 N.Y. 139, supra), this Court considered whether certain creditors were entitled to interest from a statutory fund. The Court consistently referred to distributions from the fund as payments ("remaining after the payment of those creditors who are entitled to payment [from the fund]" [id., at 146] [emphasis added]) ("there will be a large surplus of assets in his charge after the payment of the claims of creditors entitled to share in the distribution of assets here [from the fund]" [id., at 146] [emphasis added]). In *126 contrast, the Court referred to distributions made by the liquidator from the insolvent estate as dividends ("the American and foreign creditors, who dealt with the foreign branches of the company and who may share only in the distribution by the foreign liquidator, will not receive dividends amounting to as much as forty per cent of their claims" [id., at 146] [emphasis added]; see also, People v American Loan & Trust Co., 172 N.Y. 371, 376, remittitur amended 177 N.Y. 467, supra [used word "dividends" when discussing payments from insolvent estate]).
The dissent also proposes that our interpretation of "allowed claim" is "flatly contradicted" by our holding in Matter of Professional Ins. Co. (Jason  Superintendent of Ins.) (67 AD2d 850, affd for reasons stated at App Div 49 N.Y.2d 716, supra) (dissenting opn, at 134). We do not accord the same sweeping effect to Jason as does the dissent that "claims must be actually, as opposed to hypothetically, allowed by the Liquidator to be carried over against the Security Fund" (dissenting opn, at 134). In any event, even under the dissent's view of Jason, the Superintendent's argument fails. In Jason, the entire claim was marked "deferred" because claimant had failed to submit a timely proof of claim. Royal's application for postliquidation interest is not a separate claim but, rather, is an integral component of the claim which has already been determined to be an allowed claim. We reject flatly the implicit premise contained in the dissent's overreliance on Jason that two different claims are at issue here: the claim for the principal amount and the claim for interest. Instead we view Royal as having an integrated claim which Supreme Court has determined, and this Court has affirmed, to be entitled to Security Fund coverage (see, Matter of Royal Bank & Trust Co. v Superintendent of Ins., 148 Misc 2d 863, 866, affd for reasons stated below sub nom. Matter of Union Indem. Ins. Co., 179 AD2d 374, also affd for reasons stated at Sup Ct, except insofar as discussion of superseding legislation and the reasons for its enactment 80 N.Y.2d 983, supra).
The dissent further endorses the Superintendent's argument that the payment of postliquidation interest from the Security Fund would frustrate the purpose of section 7434 (b) because the Security Fund would then have a subrogation claim, pursuant to section 7609 (a), in the liquidation proceeding for the amount paid from the Fund, including interest. The dissent's concern that the subrogation rights afforded to the Security Fund by section 7609 (a) will result in the Security Fund, if it pays postliquidation interest to Royal, having a greater claim *127 against the liquidation estate than Royal itself would have had, thereby increasing the estate's over-all debt to the detriment of all other creditors sharing in the liquidated assets of the estate and frustrating the purpose of section 7434 (b) (dissenting opn, at 135) is theoretically and practically flawed.
As noted above, the Security Fund was created in order to provide payment which would be "100 cents on the dollar" and which "would be made expeditiously, in the first instance, by the Fund itself." (1969 Report to Governor by Insurance Dept, "The Public Interest Now in Property and Liability Insurance Regulation," at 61.) It was also intended that the Security Fund  not the policyholder  would then abide the results of the liquidation proceeding. (Id.) The dissent's argument implicitly indicates an underlying objection to Royal receiving a greater amount from the Security Fund than it would have received from the liquidation estate. However, the very purpose of the Security Fund is to provide those eligible for its coverage with greater protection than they would otherwise receive from the liquidation estate. Were the Security Fund limited to paying the amount recoverable from Union's estate, Royal presumably would not have gone to such litigation lengths  successfully  to have its claims declared eligible for Security Fund coverage. The Security Fund would hardly be "an extraordinary benefit" if the scope of its coverage were as limited as the dissent posits (Matter of Royal Bank & Trust Co. v Superintendent of Ins., 148 Misc 2d 863, 866, supra). In sum, once the court determined that Royal's claims were eligible for Security Fund coverage, it necessarily followed that Royal would receive a greater payment from the Fund than it would receive as a dividend from the estate and, thus, by logical conclusion, the Security Fund would have a greater subrogation claim against the estate pursuant to section 7609 (a) than Royal would have had in the first instance.
The language of section 7609 (a) also fortifies the conclusion that the subrogation rights afforded to the Security Fund by that section do not undercut the majority holding that postliquidation interest should be available in this case. Section 7609 (a) states that "[t]he commissioner * * * shall be entitled to a valid claim against an insurer which becomes insolvent or unable to meet its insurance obligations, or its liquidator, rehabilitator, conservator, receiver, or trustee in bankruptcy, in an amount equal to the liabilities * * * of the insurer paid from the fund less the net payments paid into the fund by such insurer" (emphasis added). This section 7609 (a) offset *128 manifestly indicates, therefore, that the Security Fund would not garner a dollar-for-dollar subrogation benefit against the liquidation estate. Thus, the dissent's concern that the Security Fund might secure a greater claim against the liquidation estate than Royal itself would have had is unfounded and exaggerated for purposes of making an argument that is not essentially dispositive of the fundamental issue in this case and appeal.
In any event, even accepting arguendo the dissent's position that the subrogation rights afforded to the Security Fund by section 7609 (a) present arguable policy implications, our reading of sections 7434 (b) and 7608 (c) as well as the pertinent legislative history does not require that we nullify the end-game of this perpetual motion machine litigation. We are satisfied that the statutes and their history lead to the conclusion that postliquidation interest is payable on these claims. To the extent that this result may theoretically have an unintended subrogation impact on the relationship between sections 7434 (b) and 7609 (a), that facet would be up to the Legislature to deal with and rectify.
The dissent even urges that because section 7608 (c) specifically refers to "funds," and article 76 covers only two funds  the Public Motor Vehicle Liability Security Fund and the Property/Casualty Insurance Security Fund  the statute necessarily extends to payments from the Security Fund. Because we hold, however, that the face of the bonds expressly provides for interest and attorney's fees and, thus, adding these components to the principal claim does not cause payment to exceed the "limit of liability," we need not consider Royal's argument that the legislative history of section 7608 (c) shows that the reference to "funds" in the plural was an error made during recodification. We see no reason to expand this opinion any further to respond to the dissent's remaining disagreements with the majority holding since we believe those views are sufficiently unpersuasive on their own face and expression.

V.
In sum, we hold that this controversy should finally be concluded with payment from the Security Fund on Royal's claims, including appropriate postliquidation interest and attorney's fees. Appellant Liquidator's arguments, adopted by the dissent, that Insurance Law § 7434 (b) and § 7608 (c) should be construed to prohibit satisfaction of these amounts from the Security Fund's obligation to pay fail to persuade us that the lower courts erred.
*129 Accordingly, the judgment of Supreme Court and the order of the Appellate Division brought up for review should be affirmed, with costs.
Chief Judge KAYE (concurring in part and dissenting in part).
I agree with Judge Levine's interpretation of Insurance Law § 7434 (b), and therefore join him in concluding that postliquidation interest should be denied. Otherwise, I join the majority opinion. Given the significant financial impact of the majority's reading of the statute in this case, and its potential broader implications, the Legislature might wish to revisit the pertinent statutes, to assure that for future cases the Court's construction regarding the availability of postliquidation interest is indeed the intended one.
LEVINE, J. (dissenting).
I respectfully dissent. I disagree with the majority's proposition that all questions in this case regarding "what the Legislature allowed or prohibited under the Security Fund scheme [are] matters substantive and preserved for independent judicial assessment" (majority opn, at 115 [emphasis supplied]). The Superintendent of Insurance has the central role in the administration of both the liquidation of an insolvent insurer and of the New York Property/Casualty Insurance Security Fund. The procedures for liquidating the insolvent insurer's estate and for claims against the Security Fund are complementary, and part of an intricate interlocking statutory framework for administration of liquidations, payments out of the Security Fund and subrogation rights of the Security Fund in liquidation proceedings. The Superintendent has fiscal and fiduciary responsibility regarding preservation of the adequacy of the Security Fund for creditors of all insolvent State insurers and of liquidated insolvent insurer estates, and fair treatment of all such creditors in both kinds of proceedings. For these reasons, we should defer to the Superintendent, who is charged with the responsibility of implementing these complex provisions of the Insurance Law (see, Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.  Superintendent of Ins.], 60 N.Y.2d 1, 8; Ostrer v Schenck, 41 N.Y.2d 782, 786).

I.
"The Superintendent of Insurance is vested with broad power to interpret, clarify, and implement the legislative policy" of the Insurance Law (Breen v Cunard Lines S. S. Co., 33 N.Y.2d 508, 511). *130 The Legislature has expressly bestowed such interpretive authority on the Superintendent with respect to the Insurance Law in general (see, Insurance Law §§ 201, 301), and specifically reiterated the Superintendent's power to "adopt, amend and enforce all reasonable rules and regulations necessary for the proper administration of the funds" in article 76 (see, Insurance Law § 7613).
Not surprisingly, given the expansive legislative delegation of power to the Superintendent, this Court has repeatedly recognized that the Superintendent's interpretation of the Insurance Law is entitled to deference where not irrational (see, Paramount Communications v Gibraltar Cas. Co., 90 N.Y.2d 507, 513-514, rearg denied 90 N.Y.2d 1008; Matter of John Paterno, Inc. v Curiale, 88 N.Y.2d 328, 333-334; Matter of American Tr. Ins. Co. v Abdelghany, 80 N.Y.2d 162, 167; Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 N.Y.2d 444, 448; Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.  Superintendent of Ins.], supra, 60 NY2d, at 7-8; Ostrer v Schenck, supra, 41 NY2d, at 785-786; Breen v Cunard Lines S. S. Co., supra). We have declined to accord weight to the Superintendent's interpretation of the Insurance Law only where the interpretation "runs counter to the clear wording of a statutory provision" (see, Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., supra, 66 NY2d, at 448; Paramount Communications v Gibraltar Cas. Co., supra, at 514), and, on only one prior occasion, where we deemed the question before us to be one of "pure" statutory construction and therefore unneedful of any special competence or expertise that the Superintendent might provide (Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459).
Significantly, until today, whenever this Court has been called upon to interpret the statutory provisions governing the Security Fund, we have never annulled a reasonable statutory construction by the Superintendent (see, Paramount Communications v Gibraltar Cas. Co., supra; Matter of Consolidated Mut. Ins. Co. [Arcade Cleaning Contrs.  Superintendent of Ins.], supra, 60 NY2d, at 7-8). The statutory provisions at issue here are no less ambiguous or complicated than that encountered in Arcade, where we construed the predecessor to one of the statutes applicable here  Insurance Law § 7603. Thus, we should be just as reluctant to reject the Superintendent's judgment in the matter before us as we were in Arcade.
Moreover, I do not draw the same implication as the majority that our affirmance of the Supreme Court in Matter of Royal Bank & Trust Co. v Superintendent of Ins. (148 Misc 2d 863, affd for reasons stated sub nom. Matter of Union Indem. Ins. Co., 179 AD2d 374, affd for reasons stated at Sup Ct 80 N.Y.2d 983) *131 is a precedent for rejection of deference to the Superintendent in the instant case (see, majority opn, at 123, 124). That decision, adopted by this Court, expressly applied the deference standard (see, 148 Misc 2d, at 866) but found that the Superintendent had taken conflicting positions and therefore his interpretation was unreasonable and not entitled to deference under Matter of Field Delivery Serv. (Roberts) (66 N.Y.2d 516) (see, 148 Misc 2d, at 868).[*] Therefore, our precedent at the prior stage of this proceeding only solidifies my conclusion that the Superintendent's interpretation should be upheld if reasonable.
Here, the postliquidation interest issue requires us to grapple with the intricate interplay between the Security Fund and an insolvent's liquidated estate. The Superintendent, as the legislatively designated Liquidator of the insolvent insurer's estate (see, Insurance Law § 7405 [a]) and as the administrator of the Security Fund (see, Insurance Law § 7601 [e]), is in the best position to fully appreciate the practical consequences and foreseeable legal effects on his duties resulting from the interaction between the two statutory schemes (see, majority opn, at 117 [acknowledging complexity of the pertinent statutory framework]). Deference in this circumstance will yield a more coherent, consistent body of statutory interpretation and will avoid the complications and unworkable or inequitable consequences which may ensue by permitting the courts of this State to make their own policy-based independent interpretations of these statutes.
As to the second issue  the meaning of "limit of liability" in section 7608 (c)  the majority opinion demonstrates that the resolution of this question necessarily generates further questions about the nature of the bonds secured, the policy behind the statute and the convoluted history and development of both the statute and the funds it addresses (see, majority opn, at 122-123). Where, as here, the statute is ambiguous and calls into play considerations that fall within the Superintendent's field of expertise, it is proper to assign weight to the Superintendent's construction (see, Paramount Communications v Gibraltar Cas. Co., supra, 90 NY2d, at 513-514).

*132 II.
The Superintendent denied plaintiff-respondent Royal Bank and Trust Company recovery from the Security Fund of postliquidation interest amounting to $6,632,450.29 (as of September 19, 1997) on its claims because such interest would be expressly disallowed were Royal attempting to recover the claim directly from the liquidated estate of its insolvent insurer. Even were deference to this decision not appropriate, it is evident that the Superintendent's interpretation is more consistent with the statutory language and our precedents than the rule adopted by the majority today and, thus, should prevail.
The Superintendent correctly points out that the Security Fund "shall be used in the payment of allowed claims" (Insurance Law § 7603 [a] [1] [emphasis supplied]) and that an "allowed claim" is "a claim which has been allowed by the court in a proceeding under article seventy-four of this chapter" (Insurance Law § 7602 [g] [emphasis supplied]). The procedures for taking advantage of the protections afforded by the Security Fund require the creditor first to bring the claim in the liquidation proceeding, and have it recognized by the Court supervising the liquidation, before seeking payment from the Security Fund (id.). Thus, the Superintendent argues, it logically follows that recovery which would not be "allowed" under article 74 should not be "allowed" from the Security Fund. As there is no dispute that article 74 expressly prohibits the collection of postliquidation interest from an insolvent's liquidated estate (see, Insurance Law § 7434 [b]), the Superintendent's construction is rational and consistent with the language of the applicable statutes.
The majority nevertheless rejects this construction, principally because Insurance Law § 7434 (b) solely refers to interest on "dividends," which, by definition, are distributions from the liquidated estate, and not, the majority argues, intended to correlate to "payments" out of the Security Fund (see, majority opn, at 116-117). To support its hypothesis, the majority points out that the word "payment" is used consistently throughout article 76, while the word dividend is used to refer to distributions from the liquidated estate in article 74 (id.). Thus, according to the majority, the restriction against postliquidation interest on dividends in section 7434 (b) cannot be read to apply to payments out of the Security Fund under article 76.
Concededly, the word "dividend" is used as a term of art to describe payments made to creditors out of a liquidated estate *133 (see, Black's Law Dictionary 931 [6th ed 1990]). Indeed, under article 74, all distributions on allowed claims against the liquidated estate are "dividends" because, by definition, they are payments made out of the liquidated estate. By concluding, therefore, that the prohibition against allowing a claim for postliquidation interest on a dividend under section 7434 (b) does not also translate into a prohibition against collecting a payment for that same claim from the Security Fund, the majority creates confusion over the reach of the article 74 allowed claim restriction on Security Fund payments under section 7602 (g). As the term "dividend" is used frequently in the provisions of article 74, which governs distributions out of a liquidated estate, it will be difficult to determine, under the majority's linguistic distinction between dividends and payments, whether such provisions also would be read out of the allowed claim restriction on Security Fund payments in section 7602 (g). Undoubtedly, the majority holding will have a substantial limiting impact on the scope of the allowed claim restriction and the screening process contemplated under article 76, whereby claims are submitted to the Liquidator in the first instance for "allowance."
The majority also accepts Royal's argument that, because section 7434 refers to both "payments and dividends" in subdivision (a), but only "dividends" in subdivision (b), the Legislature must have intended that the limitation on postliquidation interest in subdivision (b) does not apply to "payments" made by the Security Fund. Reliance on the inclusion of the word "payment" in subdivision (a) of section 7434, and absence of that term in subdivision (b) in connection with the prohibition against interest on dividends can only be of significance if the word "payments" in subdivision (a) was intended to mean distributions from the Security Fund. As the majority points out, the predecessor to section 7434 was enacted prior to the creation of the Security Fund (see, majority opn, at 120). In fact, the word "payments" in the current section 7434 (a) is derived from the 1932 statute which provided that the court could authorize the Superintendent "to declare out of the funds remaining in [the Superintendent's] hands after the payment of expenses one or more dividends" (L 1932, ch 191, adding former Insurance Law § 426 [emphasis supplied]).
Thus, neither the word payment nor dividend in section 7434, or for that matter, any part of article 74, was intended to refer expressly to the Security Fund  rendering any payment/dividend distinction in article 74 meaningless for our purposes. *134 Indeed, the conclusion that because article 74 does not expressly address the Security Fund, the limitations on claims created by that article do not apply to payments made from the Fund, undermines the obvious attempt, by the Legislature in article 76, to adopt such limitations by specifically permitting recovery of only those claims allowable under article 74 (see, Insurance Law § 7602 [g]).
Alternatively, Royal asserts, and the majority accepts, that the claim for postliquidation interest is actually "allowed" within the meaning of Insurance Law § 7602 (g) and § 7603 (a) (1) because had sufficient funds existed in the liquidated estate to pay all claimants in full with interest, our common-law precedents would permit Royal to recover the interest (see, Matter of People [Norske Lloyd Ins. Co.], 249 N.Y. 139, 147). This interpretation of "allowed claim" is flatly contradicted by our holding in Matter of Professional Ins. Co. (Jason  Superintendent of Ins.) (49 N.Y.2d 716, affg for reasons stated 67 AD2d 850).
Noting that the Security Fund "is available only for `allowed claims,'" the Appellate Division in Jason refused to allow a creditor to recover a claim from the Security Fund that had been deferred under former article 16 (recodified as article 74) as untimely (id., 67 AD2d, at 850). This Court adopted the lower court's analysis, including its rejection of the notion that an "allowed claim" is anything that possibly could be payable from the liquidated estate, were sufficient funds available (see, majority opn, at 120). In Jason, the deferred claim would have been recoverable from the liquidated estate after "all allowed claims, proofs of which were filed before such specified date, have been paid in full with interest" (Insurance Law § 7432 [c]). Nevertheless, the Court held that payment of the deferred claim could not be obtained from the Security Fund. Thus, Royal's alternative "allowed claim" argument fails, in that the insolvent insurer's assets in this case are concededly insufficient to pay all estate claims in full (see, majority opn, at 119), and Jason dictates that claims must be actually, as opposed to hypothetically, allowed by the Liquidator to be carried over against the Security Fund.
The majority would distinguish Jason, arguing that "Royal's application for postliquidation interest is not a separate claim but, rather, is an integral component of the claim which has already been determined to be an allowed claim" (majority opn, at 126). This argument is contradicted by the conceded fact that a claim for postliquidation interest here would not have been *135 allowable against the liquidated estate under Insurance Law § 7434 (b). It seems elementary and undeniable that a single claim might be allowed in part and rejected in part by the court supervising the liquidated estate. Indeed, that is precisely the purpose and effect of section 7434 (b), barring a claim for postliquidation interest irrespective of whether it is considered an integral component of any claim against the liquidated estate. Thus, the majority's distinguishment of Jason really comes back to its essential argument, which we have already discussed, that disallowance of interest under section 7434 (b) somehow nonetheless is not also an article 74 disallowance for the purposes of sections 7603 (a) (1) and 7602 (g).
Moreover, the policy underlying the disallowance of postliquidation interest  i.e., protecting the other creditors of the insolvent insurer  is served by denying the claim for postliquidation interest from the Security Fund (see, People v American Loan & Trust Co., 172 N.Y. 371, 379 ["Interest should not run in favor of one creditor at the expense of another, while the law, acting for all, is administering the assets"], remittitur amended 177 N.Y. 467; see also, Bill Jacket, L 1940, ch 621). Contrary to the majority's suggestion that there is no danger of prejudice enuring to other creditors when the payments are made from the Security Fund as opposed to the liquidated estate (see, majority opn, at 119), the Security Fund's treatment of claims does impact the liquidated estate and, therefore, other creditors. First, as the Court's adopted analysis in Jason provides:
"[P]rejudice indeed arises, if petitioner's deferred claim is admitted to participation in the security fund. There exists a potential for dilution of the timely filed claims, and because the security fund is built up with premiums from policyholders of all carriers writing the types of coverage specified * * * they will be burdened with additional premiums to replenish the fund earlier than contemplated by the statutory scheme, if deferred claims are allowed to participate" (Matter of Professional Ins. Co. [Jason  Superintendent of Ins.], supra, 67 AD2d, at 851 [citations omitted]).
Second, neither Royal, the courts below nor the majority provides a satisfying answer to the Superintendent's argument that, were postliquidation interest payable from the Security Fund, the subrogation provisions of article 76 would give the *136 Security Fund a claim over against the insolvent insurer's estate for that interest, in derogation of the express prohibition of section 7434 (b). The New York State Commissioner of Taxation and Finance, as custodian of the Security Fund, is "entitled to a valid claim against an insurer which becomes insolvent or unable to meet its insurance obligations, or its liquidator * * * in an amount equal to the liabilities, including loss adjustment expenses relating to such liabilities, of the insurer paid from the fund less the net payments paid into the fund by such insurer" (see, Insurance Law § 7609 [a] [emphasis supplied]).
Thus, the Security Fund, if it pays postliquidation interest to Royal, will have a greater claim against the liquidated estate than Royal itself would have had, thereby increasing the estate's over-all debt to the detriment of all other creditors sharing in the liquidated assets of the estate. Such a result clearly would contravene Insurance Law § 7434 (b), and the established principles underlying that statute (see, People v American Loan & Trust Co., supra, 172 NY, at 377-380).
The majority's conclusion that this result is acceptable because the Security Fund is designed to give creditors more than they would have gotten from the liquidated estate (see, majority opn, at 127) does not address the fundamental problem that is created by the payment from the Security Fund of postliquidation interest, which is entirely disallowed under article 74 unless all creditors of the insolvent insurer receive it. The essential conundrum is that such payment will necessarily result in unequal treatment of all creditors in the administration of the liquidated estate and will excessively deplete the Security Fund beyond its intended purpose (see, Matter of Professional Ins. Co. [Jason  Superintendent of Ins.], supra).
Of course a claimant will ordinarily get more from the Security Fund than from the liquidated estate. But, so long as postliquidation interest is denied because of its disallowance under article 74, what a claimant receives from the Security Fund will not be at the expense of other creditors in the liquidated estate. The Security Fund's subrogation rights in the liquidated estate will then not be any greater than that of the creditor who is paid from the Fund. Although the Security Fund's claim will be offset by the net payments made by the insolvent insurer to the Fund, there is nothing in the record to support the majority's apparent conclusion that this amount will counteract Royal's collection of over $6,500,000 of postliquidation *137 interest (see, majority opn, at 127-128). It would seem self-evident that Union's contribution to the Security Fund could not possibly approach this amount. That there will inevitably be resultant unequal treatment of creditors of the insolvent insurer here if Royal is paid on its postliquidation interest claim is, thus, hardly "unfounded" (see, id., at 128).
Although the Legislature has since recognized that "the Security Fund is not an appropriate vehicle for financial guaranties or to insulate investors against investment risk" (see, Mem of St Exec Dept, 1989 McKinney's Session Laws of NY, at 2057), and amended article 76 to provide that investment bonds are no longer protected by the Security Fund, the majority's decision today sets a precedent that will impact all future claims, not only for postliquidation interest in a wide range of contexts, but any and all claims where article 74 restricts or disqualifies claimants for payments of dividends. As demonstrated, this expansion of the Security Fund's obligations is to the potential detriment of all remaining creditors of an insolvent insurer's liquidated estate.
In addition, I disagree that either the legislative history or policy behind section 7434 (b) supports Royal's claim for postliquidation interest. As the majority explains, section 7434 (b) was enacted with the express purpose of overruling this Court's decision in Matter of Consolidated Indem. & Ins. Co. (281 N.Y. 680, affg 256 App Div 604, rearg denied 281 N.Y. 830), where recovery had been permitted from the liquidated estate of postliquidation interest that had accrued while the Superintendent unsuccessfully litigated the claim. In Matter of Consolidated Indem. & Ins. Co., as the dividends of the other creditors had been paid, the Court thus found that awarding interest on the delayed claim was the equitable result (see, supra, 256 App Div, at 604). Nevertheless, upon the recommendation of the Department of Insurance, our decision in Matter of Consolidated Indem. & Ins. Co. was legislatively overruled "to remove any doubt about the liability for interest on dividends" (Mem of NY Ins Dept, Bill Jacket, L 1940, ch 621, at 3).
Far from limiting the application of section 7434 (see, majority opn, at 120), the legislative history surrounding its enactment supports the Superintendent's construction here. Despite the recognized unfairness of the rule to the creditor whose claim is delayed, the bill was recommended because it was found that "it is to the advantage of all creditors of an insurance company that questionable claims be contested by the *138 liquidator" (Mem of NY County Lawyers' Assn Comm on St Legislation, Bill Jacket, L 1940, ch 621, at 5; see also, Mem of NY Ins Dept, Bill Jacket, op. cit., at 3). The same policy consideration  preventing a chilling effect on the Superintendent's decision to challenge claims and thus protect the Security Fund  applies in the instant case.
Finally, I disagree that Matter of People (Norske Lloyd Ins. Co.) (249 N.Y. 139, supra) supports the payment of postliquidation interest by the Security Fund here (see, majority opn, at 118-119). In Norske Lloyd, the "fund" at issue was actually an asset of the liquidated estate that the Legislature had required to be set aside to benefit a specific class of claimants against the liquidated estate, i.e., American creditors. As to those creditors, therefore, interest would have been an "allowable claim" because the liquidated estate assets in question were sufficient to pay all allowed claims (i.e., claims of American creditors) with interest. Here, by contrast, Royal is not a favored creditor of the liquidated estate attempting to lay claim to an estate asset that has been earmarked for a distinct class of creditors and, concededly, there are insufficient assets in the liquidated estate to pay all creditors in full with interest. Moreover, Royal's claim for interest was barred by Insurance Law § 7434 (b), enacted subsequent to the Norske decision.
The Security Fund is an alternate, supplementary remedy  an "extraordinary benefit" (majority opn, at 113) for the New York creditors of an insolvent insurer. Article 76 reflects the Legislature's intent to protect New York creditors of insolvent insurers from most, but not all, loss, and, consistent with that purpose, it limits recovery to what is a cognizable claim under article 74. The Security Fund is not isolated from the liquidation proceeding, but instead is permitted to defend claims using any defense the insurer would have the right to assert (see, Insurance Law § 7610 [a]; 1969 Report of NY Ins Dept to Governor, "The Public Interest Now in Property and Liability Insurance Regulation," at 61 ["The Fund, and not the policyholder, would then abide the results of the liquidation proceeding"]). The Superintendent's decision to deny Royal's claim for postliquidation interest reflects this carefully balanced interaction between articles 74 and 76 of the Insurance Law, and should be upheld.

III.
Turning next to Insurance Law § 7608 (c), I conclude that the Superintendent's position that the "limit of liability" of an *139 investment bond is the face, or principal, amount stated in the bond, exclusive of interest and attorneys' fees, also is a reasonable construction of the statute and, therefore, should be upheld.
First, despite arguments by Royal that reference to "surety bond" in section 7608 (c) was intended only to extend to claims arising out of corporate surety bonds protected by the Public Motor Vehicle Liability Security Fund and not bonds guaranteed by the Property/Casualty Insurance Security Fund, the statute unequivocally extends to payments from the "funds" (plural), and there are only two funds covered by article 76  the Public Motor Vehicle Liability Security Fund and the Property/Casualty Insurance Security Fund at issue here (see, Insurance Law § 7608 [c] ["No payment from the funds shall exceed the limit of liability provided for in the insurance policy or surety bond"] [emphasis supplied]). Thus, unavoidably, the restriction in the statute can only be read to include the surety bonds relevant to this appeal, payable out of the Security Fund. Certainly, at the very least, it cannot be said that the Superintendent was acting irrationally in interpreting the statute in this fashion.
To be sure, the phrase "limit of liability" more readily lends itself to common usage with respect to liability insurance policies (see, Dingle v Prudential Prop. & Cas. Ins. Co., 85 N.Y.2d 657, 659-660 [discussing policy limit as the fixed face amount of the policy coverage, exclusive of interest]). Yet, as already noted, the statute unequivocally demonstrates that the limit of liability restriction modifies "security bond" as well as "insurance policy." To give some meaningful application to this restriction as to security bonds, the Superintendent has, by analogizing to the facial coverage of insurance policies, imposed a similar, definite limit on investment bonds by interpreting "limit of liability" to be the principal amount of the bond  the only fixed amount reflected on the face of the bond. The majority's rejection of this bright line rule in favor of calculating the limit by adding together every conceivable liability covered in the bond, on the other hand, will create uncertain results and uneven application of the limit of liability restraint to security bonds.
Furthermore, contrary to the argument that Royal advances, the Superintendent's position is not internally inconsistent, and, thus, there is no basis for annulling it on that ground (see, Matter of Field Delivery Serv. [Roberts], 66 N.Y.2d 516, 520, supra). The Superintendent has conceded, correctly, that *140 defense costs and preliquidation interest may be recoverable from the liquidated estate and, therefore, were not in excess of the upper limit imposed by Insurance Law § 7608 (c), from the Security Fund (see, Matter of Transit Cas. Co. [Digirol  Superintendent of Ins.], 79 N.Y.2d 13, 18; Matter of Empire State Sur. Co., 214 N.Y. 553, 563). This position does not conflict with the Superintendent's judgment, under section 7608 (c), that recovery from the Fund should not be permitted in excess of the face amount of the bonds.
For example, preliquidation interest and attorneys' fees may well be recoverable where there had been a partial payment on principal before insolvency, leaving an available residue below the liability cap for recovery of interest and attorneys' fees. Section 7608 (c) is a monetary ceiling, and does not speak to the "type" of claim allowed. Thus, I disagree with the majority that the Superintendent's acknowledgment that preliquidation interest and the cost of defense may qualify for Security Fund coverage "undercuts the logic and cogency of his argument that the limit of liability is strictly limited to the principal amount of the bond" (majority opn, at 122).
I conclude that the Superintendent's determinations comport with the language and purpose of the statutes and are not internally inconsistent, and, therefore, merit deference by this Court. Accordingly, in all aspects, I would vote to reverse.
Judgment of Supreme Court and order of the Appellate Division brought up for review affirmed, with costs.
NOTES
[*] As we will show infra, there is no conflict in the positions taken by the Superintendent in this proceeding.